James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Maya Saxena
Joseph E. White, III
Lester R. Hooker
SAXENA WHITE P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, Florida 33431
(561) 394-3399

Katharine M. Ryan
Richard A. Maniskas
RYAN & MANISKAS, LLP
995 Old Eagle School Rd., Suite 311
Wayne, Pennsylvania 19087
(484) 588-5516

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUAN FERNANDEZ, Individually and On Behalf Of All Others Similarly Situated, | ) Civil Action No. |
| | ) |
| Plaintiff, | ) CLASS ACTION COMPLAINT  AND ) DEMAND FOR JURY TRIAL |
| | ) |
| vs. | ) |
| | ) |
| KNIGHT CAPITAL GROUP, INC., THOMAS M. JOYCE and STEVEN BISGAY, | ) ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Plaintiff Juan Fernandez ("Plaintiff") alleges upon personal knowledge as to allegations specifically pertaining to him and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Knight Capital Group, Inc. ("Knight" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Knight's website concerning the Company's public statements; and (d) review of other publicly available information concerning Knight and the Individual Defendants (as defined below).

## NATURE OF THE ACTION

1.    This is a federal securities class action against Knight and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities that purchased Knight securities from January 19, 2012 through August 1, 2012 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price.  As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.    Knight is based in Jersey City, New Jersey and is a publicly traded financial services company that provides trade execution across multiple asset classes.  The Company's common shares trade on the NYSE under the symbol "KCG."

3.    Plaintiff alleges that, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and technology practices.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that Knight lacked the deep liquidity it claimed to have and its capital position was not what the Company purported it to be; (ii) that Knight's trading technology and infrastructure

2

were in fact not sophisticated and were not appropriately checked or tested to ensure they were working properly (as required by all high frequency broker-dealers with access to the markets); (iii) that the Company lacked adequate internal and financial controls; and (iv) that, as a result of the above, Knight's financial statements were materially false and misleading at all relevant times, and positive statements about the Company's business prospects lacked a reasonable basis.

4.       On the morning of August 1, 2012, Knight installed and began using new computer coding for its trading software to push itself onto a new trading platform that the New York Stock Exchange ("NYSE") was implementing that day.  As Knight's new system went live, the Company experienced massive technological malfunctions related to the installation of the software that caused Knight to place unauthorized offers to buy and sell shares of large American companies, driving up the volume of trading and causing chaos among traders and exchanges.

5.       Knight was ultimately forced to sell the shares it erroneously purchased, causing a loss to the Company and its shareholders of $440 million.  The substantial loss drained Knight's supposed capital cushion and caused massive liquidity pressures for the Company.

6.       On August 3, 2012, SEC Chairman Mary Schapiro issued a statement regarding the Knight trading issue.   In an official SEC press release, Schapiro called the event "unacceptable" and further stated that:

> [E]xisting rules make it clear that when broker-dealers with access to our markets use computers to trade, trade fast, or trade frequently, ***they must check those systems to ensure they are operating properly.*** And, naturally, we will consider whether such compliance measures were followed in this case.

7.       Despite Knight's Class-Period assertions as to the Company's highly liquid balance sheet and financial stability, the significant losses on August 1, 2012 forced Knight to reach out to potential suitors or face possible bankruptcy.  On August 5, 2012, Knight confirmed

that it was able to strike a $400 million rescue deal with a group of investors, allowing the Company to stave off collapse.  The rescue deal was massively dilutive to Knight's existing shareholders, as it provided the rescue investors with $400 million of Knight's preferred stock with the right to buy the shares at $1.50 per share.

8.      The damage to Knight's existing shareholders was massive and irreparable. Knight had been trading at over $10 per share on July 31, 2012, just before the trading error occurred.  After the trading error and resultant losses were revealed, Knight's stock price was eviscerated and closed at $2.58 per share on August 2, 2012.  Over a two-day trading period starting on August 1, 2012, Knight's share price plummeted 75% on massive trading volume, wiping out over $750 million of the Company's market capitalization.  Since the "rescue" deal, Knight's share price has barely recovered, and the stock is still trading around $2.60 per share, leaving shareholders with substantial losses.

9.      Defendants' wrongful acts and false and misleading statements and omissions have caused a precipitous decline in the market value of the Company's stock.  Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act.  Knight maintains its corporate headquarters in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

**A.     Plaintiff**

14.     Plaintiff purchased the publicly traded Knight securities at artificially inflated prices during the Class Period and has been damaged thereby.

**B.     Defendants**

**i.      The Company**

15.     Defendant Knight is a Delaware corporation with principal executive offices located at 545 Washington Boulevard, Jersey City, NJ  07310.

**ii.      The Individual Defendants**

16.     Defendant Thomas M. Joyce ("Joyce") has served as Knight's Chief Executive Officer since December 2004, has been Chairman of the Board of the Company since December 2004 and has served as a Director since October 2002.

17.     Defendant Steven Bisgay ("Bisgay") has served as Knight's Chief Financial Officer ("CFO") since August 2007.  Prior to his appointment as CFO, Bisgay was the Managing Director, Business Development for the Company since November 2005.  Previously, Bisgay was the Group Controller for the Company since June 2003 and the Director of Internal Audit for the Company since June 2001.

18.     Defendants Joyce and Bisgay are collectively referred to herein as the "Individual Defendants."

19.     Knight and the Individual Defendants are referred to herein as "Defendants."

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Knight, were privy to confidential, proprietary and material adverse non-public information concerning Knight, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Knight's business.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the

Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Knight's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Knight's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.    The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Knight's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## SUBSTANTIVE ALLEGATIONS

### A.  Background of Knight

25.    Knight purports to be a global financial services firm that provides access to the capital markets across multiple asset classes to a broad network of clients, including buy- and sell-side firms and corporations.

26.    While Knight serves clients as a market maker, an important part of Knight's business model is employing high-speed trading software using the Company's own capital. Knight uses sophisticated algorithms in its proprietary software to place trades on a number of stock exchanges, including the NYSE. As discussed in Knight's most recently filed 10-K with the SEC on February 29, 2012, the Company touts its "deep liquidity" and "sophisticated trading technology and infrastructure" that allows it to perform high-speed trading:

> We make markets primarily in global equities and listed domestic options. Our Market Making segment combines **deep liquidity** with **sophisticated trading technology to deliver high quality trade executions** consistent with client-defined measures. We apply advanced electronic trading tools which allow buy-side (also referred to as institutions) and sell-side (also referred to as broker-

dealers) clients to interact with the market based on their specific needs and preferences. As a result, we are able to attract a significant base of clients with diverse investment styles and strategies, while at the same time, capture a greater share of client order flow. To do so, *our model requires that we manage risk and deploy capital effectively as well as maintain efficient and reliable trading technology and infrastructure*. We are connected to a large number of external market centers including exchanges, electronic communication networks ("ECN"), alternative trading systems ("ATS"), dark liquidity pools, alternative display facilities ("ADF"), multilateral trading facilities ("MTF") and other broker-dealers.

* * *

We conduct the vast majority of our market making activity as principal through the use of automated quantitative models. When acting as principal, we commit our own capital and derive revenues from the difference between the amount paid when securities are bought and the amount received when the securities are sold. Another component of our trading strategy employs the use of non-client principal trading models which interact with street flow. *These non-client principal models leverage our sophisticated trading technology and infrastructure to buy and sell equities and other financial instruments at a high rate of speed and for very short holding periods and are generally designed to benefit from pricing and arbitrage opportunities within the marketplace. [emphasis added]*

27.     In recent years, the Company and its industry have experienced a marked slowdown.  As a result, in August 2011, Knight announced it was eliminating about 6 percent of its staff by reducing sales and trading positions in equities and fixed income as well as within research, technology, operations and other support functions.  In a statement issued by the Company, CEO Joyce stated "[F]or the past two and a half years, aside from a few brief periods, we've witnessed a prolonged deterioration in market conditions.  While we largely maintained our revenue momentum, overall financial performance lagged.  In response, we focused the cuts on businesses and regions in which the competitive dynamics have shifted or the barriers simply proved too great."  Against a deteriorating industry landscape, heading into 2012, Knight was desperate to find new ways to generate revenue and meet the pressures of Wall Street expectations.

28.     In the face of these challenges, in the fall of 2011 the NYSE proposed a trading program designed to decrease the advantages enjoyed by companies employing automated trading programs such as Knight.  The NYSE program defined certain customers as retail-level participants, meaning that brokerages must prove that orders were coming from a person rather than an automated trading program.  Knight criticized the NYSE's plan.  *See* "NYSE Plan Angers Brokers," by Jacob Bunge, *Wall Street Journal*, July 4, 2012.  The NYSE officially instituted the program on August 1, 2012.

**B. False and Misleading Statements**

29.     The Class Period begins on January 19, 2012.  On this date, Knight issued a press release announcing the Company's financial and operating results for the fourth quarter of 2011 and the fiscal year ending on December 31, 2011.  The press release stated in pertinent part as follows:

> JERSEY CITY, N.J., Jan. 19, 2012 /PRNewswire/ -- Knight Capital Group, Inc. (NYSE Euronext: KCG) today reported consolidated earnings of $40.2 million, or $0.43 per diluted share, for the fourth quarter of 2011. The results included a tax benefit of $1.7 million, or $0.02 per diluted share.
>
> For the fourth quarter of 2010, the company reported consolidated earnings of $9.2 million, or $0.10 per diluted share. The results included a tax benefit of $2.1 million, or $0.02 per diluted share.
>
> Revenues from continuing operations for the fourth quarter of 2011 were $341.3 million, compared to $259.0 million from continuing operations for the fourth quarter of 2010.
>
> "In the fourth quarter of 2011, Knight produced strong financial results," said Thomas M. Joyce, Chairman and Chief Executive Officer, Knight Capital Group. "Consolidated revenues and pre-tax earnings rose considerably year over year despite a decline in market conditions as the quarter progressed. Market Making performed exceptionally well and again demonstrated the ability to adapt to the trading environment and deliver results. While the fourth quarter was not without its challenges, the contribution from Electronic Execution Services increased and we worked to improve profitability across products and services."
>
> "Continuing operations" includes the company's Market Making, Institutional Sales and Trading, Electronic Execution Services, and Corporate and Other segments. Market Making consists of all global market making across equities,

fixed income, foreign exchange and options as well as the company's activities as a Designated Market Maker at the NYSE. Institutional Sales and Trading includes full-service institutional research, sales and trading as well as equity and debt capital markets, reverse mortgage origination and securitization, and asset management. Electronic Execution Services includes Knight Direct, Hotspot FX and Knight BondPoint. Corporate and Other includes strategic investments primarily in financial services-related ventures, clearing and settlement activity, corporate overhead expenses and all other income and expenses that are not attributable to the other reporting segments.

* * *

"In 2011, Knight recorded its sixth straight year of approximately $1 in earnings per share," said Mr. Joyce. "For the full year, we maintained the number-one rankings in shares traded across NYSE- and NYSE-listed stocks, ETFs and OTC Bulletin Boards among all securities firms. In addition, Knight increased average daily U.S. equity dollar volume traded by 11 percent. At the same time, we undertook a restructuring to cut underperforming areas and efforts to refine the client offering continue."

Market Making

During the fourth quarter of 2011, the Market Making segment generated total revenues of $187.4 million and pre-tax income of $84.4 million. In the fourth quarter of 2010, Market Making reported total revenues of $111.0 million and pre-tax income of $30.0 million. Market Making had pre-tax margins of 45 percent in the fourth quarter of 2011 compared to pre-tax margins of 27 percent in the fourth quarter of 2010.

"In Market Making, Knight grew revenues 69 percent and pre-tax earnings 181 percent year over year," said Mr. Joyce. "Amid lower retail trading activity compared to the fourth quarter of 2010, Market Making maintained industry-leading market share in U.S. equities and drove the rise in average daily dollar volume traded. Near-constant enhancements to trading technologies covering platforms, models and strategies contributed to the increase in revenue capture. During the quarter, we progressed in efforts to grow European equities and U.S. options."

Institutional Sales and Trading

During the fourth quarter of 2011, the Institutional Sales and Trading segment generated total revenues of $103.8 million and pre-tax loss of $17.1 million.  In the fourth quarter of 2010, Institutional Sales and Trading reported total revenues of $112.4 million and pre-tax loss of $7.7 million.

"In Institutional Sales and Trading, Knight produced strong revenues and renewed efforts to decrease expenses," said Mr. Joyce. "We generated balanced contributions across products and regions. Further, the institutional equities and fixed income teams instituted a number of measures to increase referrals and cut

costs. During the quarter, Urban worked to secure its position among the reverse mortgage industry leaders in lending and issuance."

Electronic Execution Services

During the fourth quarter of 2011, the Electronic Execution Services segment generated total revenues of $40.6 million and pretax income of $12.5 million. In the fourth quarter of 2010, Electronic Execution Services reported total revenues of $37.1 million and pre-tax income of $10.7 million. Electronic Execution Services had pre-tax margins of 31 percent in the fourth quarter of 2011 compared to pre-tax margins of 29 percent in the fourth quarter of 2010.

"In Electronic Execution Services, Knight grew revenues nine percent and pre-tax earnings 17 percent year over year," said Mr. Joyce. "The results are due to the respective strengths of the electronic trading products as well as secular trends and, to a lesser extent, market conditions. In comparison to the fourth quarter of 2010, we witnessed growth in average daily volumes of 28 percent at Hotspot FX, 20 percent at Knight Direct and 13 percent at Knight BondPoint."

Corporate and Other

During the fourth quarter of 2011, the Corporate and Other segment reported a pre-tax loss of $16.5 million. In the fourth quarter of 2010, the Corporate segment reported a pre-tax loss of $20.2 million.

"During the fourth quarter of 2011, Knight performed extremely well," said Mr. Joyce. "Relative to the financial sector, I believe Knight's path to improving and sustaining strong financial results is straightforward. We're beginning to realize the benefits of investments in core areas and refocusing on new and innovative trading technologies that allow us to provide clients with consistent, high-quality trade executions and low transaction costs."

Headcount at December 31, 2011 was 1,423 full-time employees, as compared to 1,326 full-time employees at December 31, 2010.

As of December 31, 2011, the company had $467.6 million in cash and cash equivalents. The company had $1.5 billion in stockholders' equity as of December 31, 2011, equivalent to a book value of $15.70 per diluted share. The company had a book value of $14.51 per diluted share as of December 31, 2010.

During the fourth quarter of 2011, the company repurchased 2.0 million shares for $25.0 million under the company's existing stock repurchase program. To date, the company has repurchased 75.2 million shares for $859.5 million. The company has approximately $140.5 million of availability to repurchase shares under the program. The company cautions that there are no assurances that any further repurchases may actually occur.

30.     On February 29, 2012, the Company filed its annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2011.   The Company's 10-K was signed by Defendants Joyce and Bisgay and reaffirmed the Company's financial results previously announced on January 19, 2012.   The Company's Form 10-K also contained Sarbanes-Oxley ("SOX") certifications signed by Defendants Joyce and Bisgay, who certified:

1.          I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2011 of Knight Capital Group, Inc.;

2.          Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.          Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.          The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)          Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)          Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)          Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)          Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most

recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.        The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)        All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)        Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

(1)        The Report fully complies with the requirements of Section 13(a) or, 15(d) of the Securities Exchange Act of 1934; and

(2)        The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

31.      Defendants Joyce and Bisgay provided a substantially similar certification in each of the Company's Form 10-K's and Form 10-Q's during the Class Period.

32.      On April 18, 2012, Knight issued a press release announcing its financial and operating results for the first quarter of first quarter of 2012, ending March 31, 2012.  The press release stated in pertinent part as follows:

JERSEY CITY, N.J., April 18, 2012 /PRNewswire via COMTEX/ --Knight Capital Group, Inc. (NYSE Euronext: KCG) today reported consolidated earnings of $33.1 million, or $0.36 per diluted share, for the first quarter of 2012.

For the first quarter of 2011, the company reported consolidated earnings of $30.5 million, or $0.33 per diluted share.

Revenues from continuing operations for the first quarter of 2012 were $349.1 million, compared to $339.8 million from continuing operations for the first quarter of 2011.

"In the first quarter of 2012, Knight produced solid financial results," said Thomas M. Joyce, Chairman and Chief Executive Officer, Knight Capital Group.

"Consolidated revenues increased 3 percent while pre-tax earnings rose 9 percent year over year despite weaker market conditions. Market Making made a meaningful contribution, Institutional Sales and Trading demonstrated signs of a turnaround, and Electronic Execution Services experienced heightened trading activity across products. In addition, during the quarter, we provided the investment community with data specific to U.S. equities market making activity in order to better gauge the performance of our largest segment."

"Continuing operations" includes the company's Market Making, Institutional Sales and Trading, Electronic Execution Services, and Corporate and Other segments. Market Making consists of all global market making across equities, fixed income, foreign exchange, futures and options as well as the company's activities as a Designated Market Maker at the NYSE. Institutional Sales and Trading includes full-service institutional research, sales and trading as well as equity and debt capital markets, reverse mortgage origination and securitization, and asset management. Electronic Execution Services includes Knight Direct, Hotspot FX and Knight BondPoint. Corporate and Other includes strategic investments primarily in financial services-related ventures, clearing and settlement activity, corporate overhead expenses and all other income and expenses that are not attributable to the other reporting segments.

In the first quarter of 2012, the company modified its quarterly revenue capture and monthly equity volume statistics in order to provide data specific to its U.S. equity market making activity within the Market Making segment. The company's revenue capture and volume statistics previously also included U.S. institutional sales activity. Going forward, the company will post its U.S. equity market making volume statistics to its web site each month, and disclose, in future quarterly SEC filings, its U.S. equity market making revenue capture. The company's web site has been updated to show the new monthly volume statistics dating back to the beginning of 2010. Additionally, the revised quarterly revenue capture and volume statistics dating back to the first quarter of 2010 have been included as a schedule within this press release.

* * *

Market Making

During the first quarter of 2012, the Market Making segment generated total revenues of $152.2 million and pre-tax income of $45.1 million. In the first quarter of 2011, Market Making reported total revenues of $167.2 million and pre-tax income of $63.4 million. Market Making had pre-tax margins of 30 percent in the first quarter of 2012 compared to pre-tax margins of 38 percent in the first quarter of 2011.

"In Market Making, Knight performed well despite subdued volatility and a decline in retail trading activity that was slightly more pronounced than the overall U.S. equity market," said Mr. Joyce. "The result is attributable to the further expansion of market making activities, enhancements to trading technologies and successful cultivation of client relationships. Despite the market

conditions, Knight achieved a pre-tax margin of 30 percent during the quarter. We continued to focus on achieving profitability in European equities and U.S. options."

Institutional Sales and Trading

During the first quarter of 2012, the Institutional Sales and Trading segment generated total revenues of $142.2 million and pre-tax income of $14.7 million. In the first quarter of 2011, Institutional Sales and Trading reported total revenues of $127.4 million and pre-tax loss of $7.7 million. Institutional Sales and Trading had pre-tax margins of 10 percent in the first quarter of 2012.

"In Institutional Sales and Trading, Knight grew revenues 12 percent year over year and posted a healthy pre-tax gain after a loss a year ago," said Mr. Joyce. "The improved financial results were driven by secondary trading of ETFs and fixed income. Knight realized further benefits from continuing efforts to reduce the cost structure and reconfigure the client offering. In addition, Urban performed well due to generally favorable market conditions in reverse mortgage lending and HMBS issuance."

Electronic Execution Services

During the first quarter of 2012, the Electronic Execution Services segment generated total revenues of $44.2 million and pre-tax income of $12.3 million. In the first quarter of 2011, Electronic Execution Services reported total revenues of $40.3 million and pre-tax income of $11.4 million. Electronic Execution Services had pre-tax margins of 28 percent in both the first quarter of 2012 and in the first quarter of 2011.

"In Electronic Execution Services, Knight increased revenues 10 percent and pre-tax income 8 percent compared to the first quarter of 2011," said Mr. Joyce. "All of the electronic trading products in the segment gained market share over the past year. During the first quarter, Knight Direct and Hotspot FX each grew average daily volumes and outperformed competitors amid signs of reduced institutional trading activity in their respective categories. Likewise, Knight BondPoint established a new record for average daily volume and continued to drive execution quality in retail fixed income."

Corporate and Other

During the first quarter of 2012, the Corporate and Other segment reported a pre-tax loss of $17.6 million. In the first quarter of 2011, the Corporate and Other segment reported a pre-tax loss of $17.0 million.

"We are in the midst of the third straight year of dual declines in overall U.S. equity market volumes and volatility," said Mr. Joyce. "Nevertheless, in that time, Knight continued to grow revenues and pre-tax earnings. Given our unique client network and innovative trading technologies, I believe we are positioned to benefit from a rebound in retail and institutional trading activity."

Headcount at March 31, 2012 was 1,418 full-time employees, compared to 1,387 full-time employees at March 31, 2011.

As of March 31, 2012, the company had $336.2 million in cash and cash equivalents. The company had $1.5 billion in stockholders' equity as of March 31, 2012, equivalent to a book value of $16.23 per diluted share. The company had a book value of $14.91 per diluted share as of March 31, 2011.

During the first quarter of 2012, the company repurchased 650,000 shares for $8.5 million under the company's existing stock repurchase program. To date, the company has repurchased 75.9 million shares for $868.1 million. The company has approximately $131.9 million of availability to repurchase shares under the program. The company cautions that there are no assurances that any further repurchases may actually occur.

33.     On May 10, 2012, the Company filed its Form 10-Q for the first quarter of fiscal 2012, which was signed by Defendants Joyce and Bisgay and contained SOX certifications signed by Defendants Joyce and Bisgay.  The Form 10-Q reaffirmed the financial results presented in the Company's April 18, 2012 press release.

34.     On July 18, 2012, Knight issued a press release announcing its financial and operating results for the second quarter of 2012, ending June 30, 2012.  The press release stated in pertinent part as follows:

JERSEY CITY, N.J., July 18, 2012 /PRNewswire/ -- Knight Capital Group, Inc. (NYSE Euronext: KCG) today reported consolidated earnings of $3.3 million, or $0.04 per diluted share, for the second quarter of 2012. The results included pre-tax trading losses of $35.4 million related to the Facebook IPO, equivalent to a loss of $0.23 per diluted share, as well as a $10.0 million pre-tax investment gain in the Corporate and Other segment, equivalent to a gain of $0.07 per diluted share.

For the second quarter of 2011, the company reported consolidated earnings of $17.6 million, or $0.19 per diluted share.

Revenues for the second quarter of 2012 were $289.3 million, compared to $326.0 million for the second quarter of 2011.

"In the second quarter of 2012, Knight performed well during a challenging and eventful period in the capital markets," said Thomas M. Joyce, Chairman and Chief Executive Officer, Knight Capital Group. "Consolidated revenues remained fairly strong notwithstanding declines in retail and institutional trading activity. Pre-tax earnings were $30.8 million during the quarter, or $0.20 per diluted share,

excluding the trading losses from the Facebook IPO and one-time investment gain. We are evaluating all legal rights and remedies in connection with the Facebook IPO."

"Continuing operations" includes the company's Market Making, Institutional Sales and Trading, Electronic Execution Services, and Corporate and Other segments. Market Making consists of all global market making across equities, fixed income, foreign exchange, futures and options as well as the company's activities as a Designated Market Maker at the NYSE. Institutional Sales and Trading includes full-service institutional research, sales and trading as well as equity and debt capital markets, reverse mortgage origination and securitization, and asset management. Electronic Execution Services includes Knight Direct, Knight Hotspot FX and Knight BondPoint. Corporate and Other includes strategic investments primarily in financial services-related ventures, futures execution and custody services, clearing and settlement activity, corporate overhead expenses and all other income and expenses that are not attributable to the other reporting segments.

In the first quarter of 2012, the company modified its quarterly revenue capture and monthly equity volume statistics in order to provide data specific to its U.S. equity market making activity within the Market Making segment. The company's revenue capture and volume statistics previously also included U.S. institutional sales activity. In the second quarter of 2012, Knight modified the reporting of Knight Hotspot FX notional dollar value traded volume to count one side of the transaction. The company previously counted total client volume to include both sides of the transaction. The company posts its U.S. equity market making and Knight Hotspot FX volume statistics to its web site each month, and discloses, in quarterly SEC filings, its U.S. equity market making revenue capture. The company's web site has been updated to show the new monthly volume statistics dating back to the beginning of 2010.

* * *

Market Making

During the second quarter of 2012, the Market Making segment generated total revenues of $113.5 million and pre-tax income of $5.9 million. The results included $26.0 million in trading losses related to the Facebook IPO. In the second quarter of 2011, Market Making reported total revenues of $145.0 million and pre-tax income of $39.2 million. Market Making had pre-tax margins of 5 percent in the second quarter of 2012 compared to pre-tax margins of 27 percent in the second quarter of 2011.

"Market Making managed effectively given a decline in retail trading activity to the lowest level since the start of the financial crisis in 2008," said Mr. Joyce. "Amid heightened competition for reduced volumes, Knight maintained market share of retail U.S. equity volume year over year while Knight Link grew its percentage of consolidated U.S. equity volume executed. For the quarter, revenue capture, excluding the effect of the Facebook IPO, improved compared to the

same period a year ago which reflects considerable work to enhance trading technologies."

Institutional Sales and Trading

During the second quarter of 2012, the Institutional Sales and Trading segment generated total revenues of $109.7 million and a pre-tax loss of $7.5 million. The results included $9.4 million in trading losses related to the Facebook IPO. In the second quarter of 2011, Institutional Sales and Trading reported total revenues of $134.9 million and a pre-tax loss of $4.0 million.

"Institutional Sales and Trading continued the turnaround effort even as institutional trading activity slowed in the U.S. and Europe," said Mr. Joyce. "Measures to right-size the cost structure across equities and fixed income are taking hold as evidenced in part by the decrease in expenses year over year. The teams are recalibrating the client offering and selectively adding talent to further grow revenues. At Urban, both origination and securitization increased compared to the same period a year ago."

Electronic Execution Services

During the second quarter of 2012, the Electronic Execution Services segment generated total revenues of $43.3 million and pre-tax income of $11.3 million. In the second quarter of 2011, Electronic Execution Services reported total revenues of $41.9 million and pre-tax income of $11.8 million. Electronic Execution Services had pre-tax margins of 26 percent in the second quarter of 2012 compared to pre-tax margins of 28 percent in the second quarter of 2011.

"Electronic Execution Services produced market share gains across all products," said Mr. Joyce. "Knight Direct grew average daily volume 35 percent year over year. With a cooling off in institutional foreign exchange trading, Knight Hotspot FX posted a smaller relative decline in dollar volume than the broader market. Average daily transactions by Knight BondPoint rose 11 percent during the quarter."

Corporate and Other

During the second quarter of 2012, the Corporate and Other segment reported a pre-tax loss of $4.4 million, which included a $10.0 million pre-tax gain relating to a change in the tax status of a strategic investment accounted for under the equity method of accounting. In the second quarter of 2011, the Corporate and Other segment reported a pre-tax loss of $17.6 million.

"While the second quarter of 2012 proved difficult, Knight is accustomed to adjusting and forging ahead in various market conditions," said Mr. Joyce. "As a firm, we're stronger across the board than just a few years ago. In advancing our corporate growth strategy, Knight acquired the futures division of Penson

Financial Services during the quarter which fills a strategic gap in our client offering."

Headcount at June 30, 2012 was 1,535 full-time employees, compared to 1,465 full-time employees at June 30, 2011. The increase was largely attributable to the acquisition of the futures division of Penson Financial Services, Inc.

As of June 30, 2012, the company had $364.8 million in cash and cash equivalents. The company had $1.5 billion in stockholders' equity as of June 30, 2012, equivalent to a book value of $16.15 per diluted share. The company had a book value of $15.05 per diluted share as of June 30, 2011.

During the second quarter of 2012, the company repurchased 850,000 shares for $11.1 million under the company's existing stock repurchase program. To date, the company has repurchased 76.7 million shares for $879.1 million. The company has approximately $120.9 million available to repurchase shares under the program. The company cautions that there are no assurances that any further repurchases may actually occur.

### a. **The Truth Comes to Light**

35.     The first signs of trouble at Knight emerged on August 1, 2012.  That morning, Knight installed and began using new computer coding for its trading software to push itself onto a new trading platform that the NYSE was implementing that day.  As Knight's new system went live, the Company experienced a massive technological malfunction related to the installation of the software.  This caused Knight to place unauthorized offers to buy and sell shares of large American companies, driving up the volume of trading and causing chaos among traders and exchanges.  On August 1, 2012, Knight held as much as $7 billion in stocks purchased through its faulty trading systems.

36.     Knight was ultimately forced to sell the shares it accidentally purchased, causing a loss to the Company and its shareholders of $440 million.  The substantial loss drained Knight's supposed capital cushion and caused massive liquidity pressures.  In addition, the loss caused customers and counterparties to lose confidence in the Company.  As a result, there was substantial doubt about the Company's ability to continue as a going concern, and Knight had to reach out to potential suitors or face possible bankruptcy.

37.     On August 3, 2012, SEC Chairman Mary Schapiro issued a statement regarding the Knight trading issue.   In an official SEC press release, Schapiro called the event "unacceptable" and further stated that:

> [E]xisting rules make it clear that when broker-dealers with access to our markets use computers to trade, trade fast, or trade frequently, ***they must check those systems to ensure they are operating properly.*** And, naturally, we will consider whether such compliance measures were followed in this case.

38.     On Monday August 5, 2012, Knight confirmed that it was able to strike a $400 million rescue deal with a group of investors, allowing the Company to stave off collapse.   The rescue package was arranged by the Jefferies Group and included investments from TD Ameritrade and the Blackstone Group.   Getco and Stifel, Nicolaus & Company were also involved in the deal.   An August 6, 2012, press release issued by the Company stated in part, "[t]his capital infusion was undertaken in response to the extraordinary trading loss experienced by Knight on August 1, 2012, which significantly depleted Knight's capital base and in turn precipitated a loss of customer and counterparty confidence and liquidity crisis that, if not immediately addressed, would have threatened Knight's ability to continue to operate."   The rescue deal was massively dilutive to Knight's existing shareholders, as it provided the rescue investors with $400 million of Knight's preferred stock with the right to buy the shares at $1.50 per share.

39.     Even though Knight was ultimately saved and management was able to keep their jobs, the damage to Knight's existing shareholders was massive and irreparable.   Knight had been trading at over $10 per share on July 31, 2012, just before the trading error occurred; and traded as high $13.53 per share during 2012.   After the trading error and resultant losses were revealed, Knight's stock price was eviscerated and closed at $2.58 per share on August 2, 2012. Over a two-day trading period starting on August 1, 2012, Knight's share price plummeted 75% on massive trading volume, wiping out over $750 million of the Company's market

capitalization.  Even after the supposed "rescue" deal, Knight's share price has barely recovered, and the stock is still trading around $2.60 per share, leaving shareholders with substantial losses.

40.     Subsequent to the trading error, among other things, Knight hired IBM to review it systems and created a Board-Level Risk committee.  Joyce said Knight's technology staff is creating "new processes for verifying installation" of new code and putting in place controls on outbound orders.  "We need to re-establish our reputation for operational excellence," Joyce said. These are things that investors would have thought to have already occurred and been in place. It is in effect closing the barn doors after the horses have already left.

41.     As a result of Defendants' materially false and misleading statements and omissions during the Class Period, Plaintiff and the Class have suffered millions of dollars in damages.

42.     Knight's statements and filings during the Class Period were materially false and misleading, and omitted material adverse information concerning the Company's business, operations and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose, among other things: (i) that the Company lacked the deep liquidity it claimed to have and its capital position was not what the Company purported it to be; (ii) that the Company's trading technology and infrastructure were in fact not sophisticated and were not appropriately checked or tested to ensure they were working properly (as required by all high frequency broker-dealers with access to the markets); (iii) that the Company lacked adequate internal and financial controls; and (iv) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times, and positive statements about Knight's business prospects lacked a reasonable basis.

C.  **UNDISCLOSED ADVERSE INFORMATION**

43.     The market for Knight's securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and

failures to disclose described herein, Knight's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Knight's securities relying upon the integrity of the market price of Knight's securities and market information related to Knight and have been damaged thereby.

44.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Knight's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, and financial operations, as alleged herein.

45.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Knight's financial condition and accounting.

46.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Knight and its financial condition, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### D.  SCIENTER ALLEGATIONS

47.     As alleged herein, the Individual Defendants acted with scienter in that Individual Defendants knew that the public documents and statements issued or disseminated in the name of

the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

48.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Knight, their control over, receipt and/or modification of Knight's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Knight, participated in the fraudulent scheme alleged herein.

49.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

**E.  STATUTORY SAFE HARBOR**

50.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

51.     Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer of Knight who knew that such statement was false when made.

## F.  LOSS CAUSATION

52.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Knight's securities and operated as a fraud or deceit on Class Period purchasers of Knight's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Knight's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Knight's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

53.     By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status.  Therefore, Defendants presented a misleading picture of Knight's business practices and procedures.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Knight to conceal the truth.

54.     Defendants' false and misleading statements had the intended effect and caused Knight's common stock to trade at artificially inflated levels throughout the Class Period.  The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

55.     The decline in the price of Knight's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Knight's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the

other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Knight's securities and the subsequent decline in the value of Knight's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### G. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

56.     At all relevant times, the market for Knight stock was an efficient market for the following reasons, among others:

a.     Knight  securities met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient market;

b.     As a regulated issuer, Knight filed periodic public reports with the SEC and NYSE;

c.     Knight securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.     Knight regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

57.     As a result, the market for Knight securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Knight's stock price.   Under these circumstances, all purchasers of Knight common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

### H. CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Knight

securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Knight and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, Knight securities were actively traded on NYSE (an open and efficient market) under the symbol "Knight."  As of August 6, 2012, the Company had approximately 98 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Knight and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

60.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.      whether Defendants participated in and pursued the common course of conduct complained of herein;

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Knight;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Knight;

e.      whether the market price of Knight common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants**

64.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendants.

65.     During the Class Period, Knight and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Knight common stock; and (iii) cause Plaintiff and other members of the Class to purchase Knight stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

66.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Knight securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Knight, as alleged herein.

67.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

68.     Knight and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Knight as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Knight's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Knight and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Knight's securities during the Class Period.

69.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the

Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

70.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Knight's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Knight securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Knight shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Knight securities during the Class Period at artificially inflated high prices and were damaged thereby.

72.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business

practices, future prospects and intrinsic value of Knight, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Knight securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     By virtue of the foregoing, Knight and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

75.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

76.     The Individual Defendants were and acted as controlling persons of Knight within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.     As set forth above, Knight and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)     Awarding such other relief as this Court deems appropriate.

CARELLA, BYRNE, CECCHI,
OLSTEIN BRODY & AGNELLO
*Attorneys for Plaintiff and the Proposed Classes*

By _/s/ James E. Cecchi_____
       JAMES E. CECCHI

Dated:  October 26, 2012

Maya Saxena
Joseph E. White, III
Lester R. Hooker
SAXENA WHITE P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, Florida 33431
(561) 394-3399

Katharine M. Ryan
Richard A. Maniskas
RYAN & MANISKAS, LLP
995 Old Eagle School Rd., Suite 311
Wayne, Pennsylvania 19087
(484) 588-5516

*Attorneys for Plaintiff and the Proposed Class*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff requests a jury trial on all claims so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN BRODY & AGNELLO
*Attorneys for Plaintiff and the Proposed Classes*


By  /s/ James E. Cecchi
       JAMES E. CECCHI

Dated:  October 26, 2012


Maya Saxena
Joseph E. White, III
Lester R. Hooker
SAXENA WHITE P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, Florida 33431
(561) 394-3399

Katharine M. Ryan
Richard A. Maniskas
RYAN & MANISKAS, LLP
995 Old Eagle School Rd., Suite 311
Wayne, Pennsylvania 19087
(484) 588-5516

*Attorneys for Plaintiff and the Proposed
Class*